**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANTS:

**JOHN JOHNSTON**
Wabash, Indiana

ATTORNEYS FOR APPELLEES:

**STEPHEN H. DOWNS**
Wabash, IN



FILED
Mar 28 2013, 9:19 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| HOWARD OSBORNE and KIMBERLY EASTERDAY, | ) ) ) | |
| Appellants-Respondents, | ) ) ) | |
| vs. | ) ) | No. 85A04-1209-ES-482 |
| TINA R. BERGER and CARLA HALL, CO-PERSONAL REPRESENTATIVES OF THE ESTATE OF ELBERT H. OSBORNE, DECEASED, | ) ) ) ) ) ) | |
| Appellees-Petitioners. | ) | |

APPEAL FROM THE WABASH CIRCUIT COURT
The Honorable Robert R. McCallen, III, Judge
Cause No. 85C01-1102-ES-20

**March 28, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

Howard Osborne ("Osborne") and Kimberly Easterday ("Easterday") (collectively, "the Objecting Heirs") appeal the trial court's order, which approved the co-personal representatives', Tina Burger ("Burger") and Carla Hall ("Hall") (collectively, "the Co-Personal Representatives"), amended petition for a final account in the Estate of Elbert H. Osborne ("Elbert") and ("the Estate").

We affirm.

## ISSUE

Whether the trial court erred by approving the Co-Personal Representatives' amended petition for a final account over the Objecting Heirs' objections.

## FACTS

Elbert had five children, including four daughters—Burger, Hall, Easterday, and Katherine Stangl ("Stangl")—and one son, Osborne. Elbert died testate on February 4, 2011. Elbert's will provided that his estate would be divided equally among his five children ("the Sibling-Heirs").

At the time of his death, Elbert had four joint bank accounts ("the joint accounts") with Burger. These four accounts totaled $77,652.24 and included: (1) a checking account with $14,089.65; (2) a saving account with $50,448.32; (3) a certificate of deposit with $3,002.82; and (4) a certificate of deposit with $10,111.45. Elbert also had a $9,000 life insurance policy, which named Burger as the sole beneficiary.

On February 23, 2011, the Sibling-Heirs went to the office of attorney for the Estate. Burger informed the attorney about the joint accounts and initially told the

2

Sibling-Heirs that she would share the joint checking and savings accounts with them. However, within a few days, Burger decided not to divide the money in the joint accounts. On February 28, 2011, the Co-Personal Representatives filed a petition to probate the will and open the Estate, which the trial court granted.[1]

Thereafter, some of the Sibling-Heirs indicated that they needed money from the Estate. On April 6, 2011, Burger took $65,074.93 from the joint accounts and deposited it into the Estate checking account. The Estate checking account had a balance of $466.02 prior to Burger's deposit.

On April 11, 2011, Burger, as personal representative, made advance distributions from the Estate to the Sibling-Heirs. Burger wrote checks from the Estate checking account for $12,500 to all of the Sibling-Heirs, except Stangler who received Elbert's Cadillac valued at $12,500. When Burger filled out the check ledger for the checks written to the Sibling-Heirs, she made a notation that the checks were for "INHERT." or "INHER." (Appellants/Respondents' Ex. C at 2).

Also on April 11, Burger also wrote a check from the Estate account for $3,035 to pay Elbert's 2010 federal taxes. Between April and June 2011, the Estate had approximately an additional $6,000 of expenses that were paid. On June 23, 2011, the Estate received proceeds of $41,271.07 from an auction of Elbert's personal property. On July 5, 2011, the Estate received proceeds, totaling $9,500, from the sale of Elbert's mobile home.

---

[1] The trial court initially ordered that the administration of the Estate was to be unsupervised but later ordered that it be supervised upon a petition from Osborne.

Sometime in July 2011, Burger met with her three sisters and discussed the possibility of sharing some of the joint accounts and her life insurance proceeds with them, but not Osborne. She gave them a paper showing how she might divide the funds. The paper indicates that any division of these accounts would have $12,500 deducted from it.

On September 16, 2011, the Co-Personal Representatives filed a Personal Representatives' Inventory, which listed Elbert's property that was part of the Estate. The Inventory also listed the joint accounts but specifically excluded them from being part of the Estate.

On January 10, 2012, the Co-Personal Representatives filed a Final Account, Petition to Settle and Allow Account, and Petition for Authority to Distribute Assets Remaining and Close Estate ("Final Account"), which they later amended on July 31, 2012. The Final Account indicated that the Estate had a net total of $67,667.74 available for distribution, which resulted in a $13,533.55 share to be received by each of the Sibling-Heirs. In the Final Account, the Co-Personal Representatives noted that the Sibling-Heirs had already received an advance distribution of $12,500 that had been paid with Burger's personal funds.

The Objecting Heirs filed objections to the Final Account, arguing, in part, that the joint accounts should have been included as a probate asset of the Estate and available for distribution among the Sibling-Heirs because Burger told the Sibling-Heirs that she would divide the joint accounts with them. They also asserted that Burger intended for the joint accounts to be part of the Estate because she deposited the funds in the Estate

4

checking account and then distributed $12,500 to the Sibling-Heirs from the Estate checking account.

The Co-Personal Representatives filed a response, arguing that the joint accounts became Burger's accounts upon Elbert's death and explaining that Burger deposited money from the joint accounts, which were then her accounts, into the Estate checking account "only for the purpose of making advancements of estate shares to her sibling[-heirs]." (App. 49).

On August 22, 2012, the trial court held a hearing on the Final Account and the objections. During this hearing, the Objecting Heirs argued that the $12,500 distribution was a gift from Burger to the Sibling-Heirs.

Burger, however, testified that although she initially told the Sibling-Heirs that she would share the joint checking and savings accounts, she changed her mind "[w]ithin days." (Tr. 59). Burger testified that she especially did not want to share any of the joint accounts with Osborne because he had not been close to Elbert prior to his death. Burger testified that she deposited the money from the joint accounts into the Estate checking account so that she could cover the expense of making early distributions to her Sibling-Heirs, who had indicated that they needed money. She also testified that when she deposited the money into the Estate checking account, she did not intend to give up control of the money and that she knew she could be reimbursed after the auction of Elbert's personal property. She also testified that when she distributed the $12,500 to the Sibling-Heirs, she was giving them an advance from the Estate and not a gift. Burger

5

testified that when she met with her sisters in July 2011 to discuss the possibility of dividing some of the joint accounts, she told them not to "hold [her] to that." (Tr. 61).

During the hearing, Osborne testified that Burger and Elbert were very close and acknowledged that he was not close with Elbert and had not seen him for approximately ten years before his death. Osborne acknowledged that the joint accounts were Burger's accounts and that he was aware that Burger put money from the joint accounts into the Estate checking account so that she could make distributions to the Sibling-Heirs and pay bills for the Estate. He, nevertheless, thought that Burger intended to make a gift and divide the joint accounts with the Sibling-Heirs.

On August 24, 2012, the trial court entered an order, determining that the joint accounts were non-probate assets and approving the Co-Personal Representatives amended petition on the Final Account over the Objecting Heirs' objections. In relevant part, the trial court concluded as follows:

> The court believes that the way things were handled gave rise to numerous arguments as to Tina Burger's intentions with respect to non-probate property. However, the joint accounts she held with the Decedent were non-probate property. The court believes she put those monies into the estate to ensure the estate was solvent and to pay a proportionate share of the probate assets to each of the beneficiaries that she felt would cover the expected receipts from a later auction and sale of probate assets. Her statement that she would include the non-probate property in the estate and distribute them to all heirs, followed by a later and different statement excluding Howard Osborne from any portion thereof, reflects, in the court's opinion, her exercise of dominion and control over the non-probate property and her belief they remained hers, to do with as she pleased.

(App. 7). The Objecting Heirs now appeal.

DECISION

The Objecting Heirs argue that the trial court erred by determining that Burger's deposit of funds from the joint accounts into the Estate checking account did not constitute a gift to the Objecting Heirs and by approving the Co-Personal Representatives' amended petition for a final account.

The trial court here issued sua sponte findings of fact and conclusions thereon. Sua sponte findings control only as to the issues they cover, and a general judgment will control as to the issues upon which there are no findings. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). We will affirm a general judgment entered with findings if it can be sustained on any legal theory supported by the evidence. *Id.* In reviewing a judgment, we must determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* We will neither reweigh the evidence nor judge the credibility of the witnesses. *In re Trust Created Under Last Will & Testament of Mitchell*, 788 N.E.2d 433, 435 (Ind. Ct. App. 2003).

Before addressing the issue of whether Burger's deposit of funds from the joint accounts and payment of $12,500 constituted a gift to the Sibling-Heirs, we note that issues involving joint ownership of bank accounts are controlled by statute. Specifically, Indiana Code § 32-17-11-18 provides, in relevant part, that "[s]ums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention at the time the account is created."

The Objecting Heirs do not dispute that the funds in the joint accounts belonged to Burger upon Elbert's death. Instead, the Objecting Heirs argue that "Burger made a gift of the jointly owned non-probate funds when she deposited the funds in the estate checking account." Appellants' Br. at 10.

An *inter vivos* gift "is one by which the donee becomes in the lifetime of the donor the absolute owner of the thing given." *Shourek v. Stirling*, 652 N.E.2d 865, 867 (Ind. Ct. App. 1995) (citing *Hopping v. Wood*, 526 N.E.2d 1205, 1207 (Ind. Ct. App. 1988)). In addition to the competency of the donor, a valid *inter vivos* gift requires a showing that: (1) the donor intends to make a gift; (2) the gift is completed with nothing left undone; (3) the property is delivered by the donor and accepted by the donee; and (4) the gift is immediate and absolute. *Fowler v. Perry*, 830 N.E.2d 97, 105 (Ind. Ct. App. 2005). "Succinctly stated, for a valid gift *inter vivos* of personal property, there must be a delivery of the property with an intention to give. The donor must intend to part irrevocably with absolute title and control of the thing given at the time of making the gift." *Hopping*, 526 N.E.2d at 1207 (citation omitted). "The donor's intent is generally a question of fact for the trial court." *In re Estate of Warman*, 682 N.E.2d 557, 563 (Ind. Ct. App. 1997), *trans. denied*.

The Objecting Heirs contend that Burger made a gift of the funds in the joint accounts because she: (1) told the Sibling-Heirs that she would divide funds from the joint accounts with them; (2) deposited funds from the joint accounts into the Estate checking account; and (3) distributed $12,500 to four of the five Sibling-Heirs.

The Objecting Heirs, however, fail to recognize that the evidence regarding the element of Burger's intent does not support their argument that she made a gift when she deposited funds from the joint accounts into the Estate checking account and made advance distributions from the Estate. Burger testified that although she initially told the Sibling-Heirs that she would share the joint checking and savings accounts, she changed her mind "[w]ithin days." (Tr. 59). Additionally, Burger testified that she deposited the money from the joint accounts into the Estate checking account so that she could cover the expenses of the Estate, including early distributions to her Sibling-Heirs who had indicated that they needed money from the Estate. Indeed, Osborne acknowledged that the joint accounts were Burger's accounts and that he was aware that Burger put money from the joint accounts into the Estate checking account so that she could make distributions to the Sibling-Heirs and pay bills for the Estate. Furthermore, the evidence reveals that prior to Burger's deposit of the money into the Estate checking account, the account had a balance of $466.02 and that she paid Estate expenses, including $3,035 for Elbert's federal taxes and $5,283.39 for Elbert's funeral, after she made the deposit. Burger also specifically testified that when she deposited the money into the Estate checking account, she did not intend to give up control of the money and that she knew she could be reimbursed after money came in from the sale of Elbert's property. Furthermore, Burger testified that the $12,500 distribution to the Sibling-Heirs was an advance distribution from the Estate and not a gift. Indeed, the evidence revealed that one of the Sibling-Heirs received a car as an advance distribution, thereby supporting Burger's testimony.

9

Because there is evidence from which the court could conclude no gift was intended, we affirm the trial court. *See, e.g.*, *Matter of Estate of Goins*, 615 N.E.2d 897, 901-02 (Ind. Ct. App. 1993) (affirming the trial court's determination that no gifts of a certificate of deposit and tractor were intended where evidence supported such determination), *reh'g denied*, *trans. denied*. *See also Warman*, 682 N.E.2d at 564 (explaining that it is for the trial court to resolve factual conflicts regarding determination of whether a valid *inter vivos* gift occurred). The Objecting Heirs' argument to the contrary is merely a request for this court to reweigh the evidence and the credibility of witnesses, which we cannot do.

Affirmed.

ROBB, C.J., and MAY, J., concur.